## ST. JOHNS RIVER WATER MANAGEMENT DISTRICT v. CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS

### Case No. 82-1504

Ninth Judicial Circuit, Osceola County

October 29, 1984

### APPEARANCES OF COUNSEL

**Christopher C. Skambis** and **Vance W. Kidder** for plaintiff.

**Kenneth G. Oertel** and **Segundo J. Fernandez, Oertel & Hoffman,** for defendant.

### OPINION OF THE COURT

CECIL H. BROWN, Circuit Judge.

This action, initiated on a complaint filed by the plaintiff St. Johns River Water Management District (hereinafter "the District") against the defendant Corporation of the President of the Church of Jesus Christ of Latter-Day Saints (hereinafter "Deseret"), with a counter-claim by Deseret against the District, came before the Court for trial on June 19 and 20, 1984 at the Osceola County Courthouse in Kissimmee, Florida. The Court, having ruled on April 30, 1984 that summary final judgment would be entered in favor of the District on

its complaint and Deseret having voluntarily dismissed, without prejudice, Counts II and III of its counterclaim, heard testimony solely with respect to Count I of Deseret's counterclaim.

At the commencement of the proceedings on Count I, Deseret's counsel identified the sole issue remaining for trial as whether or not Deseret was exempt from the permitting requirements of Chapter 373, Florida Statutes, by virtue of the exemption from those requirements contained in Section 403.813(2)(g), Florida Statutes (1983).

The Court having received the evidence offered by the parties and having duly considered all of the evidence and the arguments and memoranda of counsel upon the issue in this cause, thereupon renders the following:

## FINDINGS OF FACT

1. The area of Deseret's property that we are concerned with here is near or on the St. Johns River Prairie or flats which consists of a vast marsh in which shallow water (water sheet) flows to the north. This marsh appears to be within the headwaters area of the St. Johns River. A perimeter dike with internal drainage ditches was constructed around this particular tract by a prior owner of the property in the late 1940's or early 1950's. The property in question is approximately 2000 acres and is a very small portion of Deseret's ownership. The bulk of the property in question is located in Sections 2, 3, and 4, Township 30 South, Range 35 East, Brevard County, Florida. For proper identification, the property has been circled on Deseret's Exhibit #1 in evidence.

2. considering the soils used for construction in this area, continuous maintenance would have been necessary to keep the dike functional.

3. Deseret has not performed any maintenance work on the perimeter dike or the internal drainage ditches on its property for approximately 25 years, despite muck fires in the late 1950's and early 1960's which substantially destroyed the eastern half of the dike. Two significant breaches occurred many years ago, one of which was intentionally created in the dike, at or below ground level of the marsh.

4. The chief purpose of a perimeter dike is to prevent water from either getting in or getting out of the area protected by the dike. Deseret's own employee, Robert Justesen, testified that Deseret's perimeter dike has been unable to keep water on or off the property since the dike burned about 25 years ago.

5. The existing condition of the internal drainage ditches on Deseret's property is substantially similar to the original condition of those

ditches but for vegetation which has not been removed and relatively minor silting in the southeastern corner of the internal seepage ditch.

6. The soils used to construct the perimeter dike range from sand and clay on the western extremities of Deseret's property to muck and peat soils on the eastern extremities of the property. In part due to the variation in soil type used to construct the dike, the existing condition of the seven and one-half mile long perimeter dike varies substantially. The western half of the dike, constructed principally from sand and clay is in comparatively good condition. The eastern half of the dike, constructed principally of muck and peat remains there in only vestigial portions. Due to the muck fires during the late 1950's and early 1960's, more than one mile of the eastern portion of the perimeter dike is less than two feet above ground level of the marsh. Two breaches in the dike exist at or below ground level of the marsh. One of the breaches is located in the northeast corner of the property. Deseret's own expert, William Kerr, testified that of the seven and one-half miles of perimeter dike involved, four and one-half miles would need no work and three miles would need significant work. Mr. Kerr estimated that 95,000 cubic yards of fill would be necessary to build up that three-mile segment of the dike to his estimate of the original design specifications. Depending on the determination made with respect to the original design specifications for the dike, the deterioration on the eastern half of the dike represents, at a minimum, a 50% reduction, and as much as an 84% reduction, from those estimated original specifications.

7. The original design specifications of the perimeter dike were the subject of substantial disagreement between witnesses. In Deseret's case in chief, the evidence reflected the following original dike height estimates from the identified sources:

— C.W. Adams   8 feet high from personal observation

— Fred M. Sanderson   4 to 5 feet high from personal observation

— William Kerr   7 to 8 feet high based on expert opinion

Documents of William Kerr, Sr.   5 feet high.

In the District's case in chief, the evidence reflected three additional estimates of the original dike height based on personal observation:

— Carl Johns   5 feet high

— Robert Justesen   10 to 12 feet high

— Orville Vawter   10 feet high.

8. Based on the evidence presented, there does not appear to have

**63**

been original design specifications for the dike. As a consequence, Deseret has not met and cannot meet its burden of proving the original design of the perimeter dike.

9. Deseret has found the time and necessity for maintenance of other dikes and drainage ditches on its property during the past 20 years.

10. Originally the perimeter dike and ditch system included a pump station with three large capacity pumps at the midpoint of the north boundary of the property. The pumps were intentionally removed in the late 1960's or early 1970's. The removal of the pumps appears to have been an abandonment of use of the dike. This may have contributed to the deterioration of the dike. If a pump is necessary to the functioning of the dike, it cannot be considered "existing".

Based on the above-recited facts and the remaining evidence adduced in support of these findings of fact, the Court reaches the following:

## CONCLUSIONS OF LAW

1. This Court has personal jurisdiction of the District and Deseret and has jurisdiction of the subject matter of this action.

2. The District is a governmental entity established by Chapter 373, Florida Statutes. The District has implemented a permitting program pursuant to Section 373.403, *et seq.*, having adopted rules applicable to that permitting program appearing in Chapter 40C-4, Florida Administrative Code. The permitting program established pursuant to those statutes and rules is commonly referred to as "management and storage of surface waters" permitting.

3. The District's boundaries are described by a legal description appearing in Section 373.069(2)(c), Florida Statutes. The property in question is located within the geographic boundaries of the District. The statutory permitting authority of the District applies to the property in question.

4. Deseret, as the party seeking a declaratory decree herein, has the burden of proof on every material element of its request for relief. The degree of proof required on each element is clear and convincing evidence. *Robinson v. Fix*, 113 Fla. 151, 151 So. 512 (1933). Deseret failed to meet that burden. However, assuming, *arguendo*, that the degree of proof required was a preponderance of the evidence, Deseret failed to meet the burden imposed by the lesser standard.

5. Deseret relies on Section 403.813(2)(g), Florida Statutes (1983) in claiming that it is exempt from the permitting requirements of Chapter 373. The exemption statute provides, in part,

2. No permit under Ch. 403 or Ch. 373 . . . shall be required for activities ties associated with the following types of projects:

. . . . . . . . . . .

(g) The *maintenance* of *existing* . . . dikes and drainage ditches . . . In all cases, no more dredging is to be performed than is necessary to restore the dike or ditch to its original design specifications. (Emphasis added.)

6. Interpretation of Section 403.813(2)(g), Florida Statutes (1983) is a case of first impression. Neither party to this action has identified any case law interpreting that section. The court has not discovered any authority interpreting that section on its own initiative. The Court concludes that it must construe Section 403.813(2)(g) in order to determine the respective rights of the parties to this action. However, the Court is guided by the principle that statutory exemptions are to be strictly construed against those claiming the exemption. *Pal-Mar Water Management District v. Board of County Commissioners*, 384 So.2d 232 (Fla. 4th DCA 1980).

7. Deseret focuses on the words "existing" and "restore" in the statute. Deseret claims that because a remnant of a dike, albeit a substantial remnant in some places, is visible on the property, the dike is "existing". Deseret's argument continues that whatever work is required to restore the dike to its initial design specifications, regardless of its scope or extent and regardless of the lack of maintenance during an extended period of time, the work may be performed without a permit.

8. The District focuses on the terms "maintenance" and "existing". The District contends that maintenance of an existing structure is no more than the routine custodial maintenance necessary to preserve the structure from deterioration within reasonable limits. The District contends that the maintenance exemption in Section 403.813(2)(g), Florida Statutes was not intended to remove construction activity of the magnitude proposed by Deseret from the operation of the statute. The District contends that the concepts of "maintenance" and "restoration" are comparative in nature and require an examination of:

   a) the comparative length of time between normal routine maintenance and actual maintenance activities on the structure; and

   b) the comparative physical characteristics of the existing structure with its original design configuration.

   c) the function of existing remnants of the original system.

9. The Court must turn to traditional principles of statutory

**65**

construction to determine the meaning of Section 403.813(2)(g), Florida Statutes (1983). One of those principles is to give words their common and ordinary meaning. The term "maintenance" is defined as "the act of maintaining". the term "maintain" is defined as "to keep in an existing state (as of repair, efficiency, or validity): preserve from failure or decline. . . ." Webster's Ninth New Collegiate Dictionary (1983). The use of the phrase "keep . . . existing" in the definition of maintain is important in understanding the use of the word "existing" in the statute. Deseret does not wish to preserve that perimeter dike in its existing state. Similarly, Deseret does not wish to preserve that perimeter dike from failure or decline. Substantial portions of the dike have already failed or declined and Deseret now seeks to rebuild those portions of the dike.

While Deseret seeks to look at the condition of the perimeter dike by averaging the condition of the dike over its entire length, Deseret has admitted that a dike is only as good as its lowest and weakest point. With two complete breaches and more than one mile of the dike in serious disrepair, the Court must conclude that the work which Deseret proposes to accomplish is more than "maintenance". If the Court were to accept Deseret's proposition, then any structure would be "existing", regardless of the extent of deterioration, and could be rebuilt without a permit. That construction of the exemption would destroy the salutary purposes of Chapter 373 and Chapter 403 and, as such, cannot be a proper interpretation of the statute. *Indian Harbour Beach v. Melbourne*, 265 So.2d 422 (Fla. 4th DCA 1972).

10. To the extent that the meaning of the statute may be ambiguous, the Court may also look to other traditional principles of statutory construction in interpreting Section 403.813(2)(g), Florida Statutes (1983). First, Section 403.813(2)(g) should be read *in pari materia* with Section 373.403(8) which provides as follows:

"Maintenance" or "repairs" means remedial work of a nature as may affect the safety of any dam, impoundment, reservoir, or appurtenant work or works, but excludes routine custodial maintenance.

The legislature excluded only routine custodial maintenance from the permitting requirements of Chapter 373. From the evidence presented, Deseret did not perform maintenance of a routine custodial nature for a period of approximately 25 years. Routine maintenance would have been either continuous or on a periodic basis of no more than every 4 to 5 years. In addition, Section 403.813(3) and Section 403.814(1)

66

authorize establishment of a system of general permits for those activities having a minimal adverse environmental impact. To the extent that the Secretary of the Department of Environment regulation establishes a general permitting program, the exemptions contained in Section 403.813(2)(g) are superseded. While the Secretary has not created a general permitting process for maintenance work, the legislature's conception of the exemption reflects that the exemption applies only to routine maintenance having a minimal adverse environmental effect. The legislative committee tapes introduced into evidence by the District support this interpretation. The amount of water which can be diverted or impounded as a result of increasing the height of Deseret's perimeter dike by one foot is so substantial that the Court can only conclude that the possibility of adverse environmental effect is more than minimal.

11. Finally, Deseret presented evidence concerning the interpretation of the maintenance exemption by a former employee of the Department of Environmental Regulation. Reese Kessler, whose duties with the Department included applying the statute to specific factual situations, testified that in the event that intentional breaches in the perimeter dike were made, the DER would *not* consider the work to be performed by Deseret as maintenance and therefore not exempt from the permitting requirements of Chapter 373, Florida Statutes. Several witnesses, including Deseret's own employees, testified that Deseret had, at some point in time, intentionally caused at least one of the existing breaches in its perimeter dike. Further, the Court, throughout these proceedings has been made aware of the District's interpretations of the statute. Contemporaneous interpretations of statutes by those charged with administering, enforcing and interpreting them are entitled to great weight, and should not be rejected unless clearly erroneous. *Gay v. Canada Dry Bottling Co. of Florida, Inc.*, 59 So.2d 788 (Fla. 1952); *Department of Revenue v. Skop*, 383 So.2d 678 (Fla. 5th DCA 1980); *Austin v. Austin*, 350 So.2d 102 (Fla. 1st DCA 1977); *Metropolitan Dade County v. Maddox*, 242 So.2d 165 (Fla. 3d DCA 1970).

12. For the reasons set forth hereinabove, this Court finds that Deseret has failed to meet its burden of proving entitlement to the maintenance exemption under Section 403.813(2)(g), Florida Statutes (1983). Therefore, to the extent that Deseret wishes to perform work on its perimeter dike system it must obtain a permit from the St. Johns River Water Management District pursuant to Chapter 373 prior to commencing that work.

13. The Court further holds that with respect to the internal

drainage ditches on Deseret's property, Deseret may remove vegetation existing in those ditches without the need for obtaining a permit from the St. Johns River Water Management District; however, Deseret may not excavate material other than vegetative material from those ditches without obtaining a permit from the District.

14. The Court will reserve jurisdiction for the purpose of taxation of costs and for the purpose of entering any further orders which may be necessary to carry out its decree.